UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**PATRICIA M. ARROYO,**<br><br>                           Debtor<br><hr><br>**PATRICIA M. ARROYO,**<br><br>                           Plaintiff<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF EDUCATION,**<br><br>                           Defendant | Chapter 7<br>Case No. 08-11216-FJB<br><br><br><br><br><br>Adversary Proceeding<br>No. 08-1122 |

**MEMORANDUM OF DECISION**

By her complaint in this adversary proceeding, the chapter 7 debtor, Patricia Arroyo (the "Debtor"), seeks a declaration that her obligation on a student loan held by the United States Department of Education (the "DOE") is dischargeable under 11 U.S.C. § 523(a)(8) on the basis that excepting this obligation from discharge would impose on her an undue hardship.  Having now tried that matter, and for the reasons set forth below, the Court finds that the Debtor has failed to carry her burden.

**FACTUAL BACKGROUND**

At trial, the Debtor testified on her own behalf and offered nine documentary exhibits.  For its case, the United States offered five documentary exhibits, including the Debtor's testimony from an

October 17, 2008 deposition and excerpts from the DOE's "Private Collection Agency Procedures Manual."[1] From this evidence, the following facts emerge.

### a. The Debtor's Education and Work Experience

The Debtor, fifty-two years old at trial, is a single woman who resides in a rented apartment in Salem, Massachusetts. She has no dependents. She has a bachelor's degree from the University of California at Santa Cruz, a master's degree in psychology from Biola University, and a Ph.D. in clinical psychology from the California School of Professional Psychology (now called "Alliant University"). She is a licensed psychologist. Since 1997, she has operated her own private psychology practice in Boston, Massachusetts. She has no medical conditions that prevent her from working.

The Debtor incurred the educational loan debt at issue while pursuing graduate studies in psychology. From 1981 through 1990 she borrowed between $70,000 and $80,000 in student loans to finance her tuition and living expenses. She finished her course work in 1987, but spent an additional three years completing her dissertation and pre-doctoral internships. She continued to pay tuition during this time so that she could receive full-time accredited status at her school, which kept her loans in deferral. While completing her degree, she was "essentially unemployable." A full-time course load and internships left only evenings and weekends for income-earning employment. Without a license to practice psychology, she was limited to administrative jobs in hospitals. Meanwhile, interest on her unsubsidized loans, "as high as 15, 16, 17 percent," went unpaid. The Debtor estimated that by the time she received her Ph.D. in 1990, she owed about $120,000 on the loans.

After earning her Ph.D., the Debtor worked at a six-month unpaid internship at a children's hospital and as a personnel director at a community health center in San Francisco. In August of 1991,

---

[1] The Manual covers the methods and procedures followed by loan servicers working on behalf of the DOE to negotiate loan repayment plans under the William D. Ford Federal Direct Loan Program, 34 C.F.R. §§ 685.100, et seq.

2

she was hired by Dartmouth College and moved to New Hampshire. From 1991 to 1997, she worked as a staff psychologist in Dartmouth College's student counseling center, earning between $30,000 and $33,000 annually. She became licensed to practice psychology in New Hampshire in 1992. When she began her job at Dartmouth, the Debtor's student loan payments were "about $1,100 a month." Her take-home pay from Dartmouth was about $2,000 a month. To supplement her income, she saw private clients in the evenings. She was able to completely pay off some of her smaller loans.

In 1995, she consolidated her remaining student loan debt through the DOE's National Direct Loan Program. The amount of the consolidated loan (the "Student Loan") was $129,676.52. Around this time, the Debtor also took advantage of the DOE's "Income Contingent Repayment Plan" (the "ICRP"), 34 C.F.R. § 685.209, part of the DOE's William D. Ford Federal Direct Loan Program (the "Ford Program"), 34 C.F.R. § 685.100 et seq. As I understand it from the materials in evidence and the applicable regulations, an ICRP fixes a borrower's monthly payment at a percentage of her discretionary income. 34 C.F.R. § 685.209(a)(2). Unpaid interest is capitalized until the outstanding principal is ten percent greater than the original principal amount and, provided the debtor does not default, remains capped at that amount. 34 C.F.R. § 685.209(c)(5). Under ICRP, the Debtor's monthly payment was reduced to $502. Unpaid interest accrued and was capitalized (*i.e.,* added to the principal balance) until the balance of the loan was $138,782.98 as of August 29, 1996. For the next 15 months, she remained current with her payments. These payments went entirely to interest and did not reduce principal.

The Debtor decided to get training in a specialty area that she understood "would have a good chance of a six-figure income." She settled on becoming qualified as a guardian ad litem ("GAL") and, to that end, enrolled in a training program in child forensic psychology at Massachusetts General Hospital in Boston. In 1997, she became licensed to practice psychology in Massachusetts. By 1998, she had left Dartmouth to run a private practice in Boston full-time.

3

During the first years of her Boston practice, the Debtor's income was "wildly erratic." The bulk of her earnings came from GAL appointments in the Massachusetts Probate Court. Although retainers for these services ranged from $3,000 to $5,000, appointments were few. The Debtor found GAL work "really stressful," commenting, "I hate being at trial, I hate being deposed." Trials, where a GAL can earn additional fees for testifying, were rare; the Debtor had only three cases go to trial in ten years. However, when one of her cases did go to trial in 2007, she earned $103,247 in gross income for the year.[2] To increase her income, she "cobbled a few other things together." She did parent coordination work and divorce counseling. She performed forensic evaluations through the New England Medical Center and received client referrals from other group practices under fee-splitting arrangements. She also had an independent contractor position with a company that did "critical instant stress debriefings." She did one or two debriefings in the wake of the September 11 terrorist attacks and occasionally got hired when a company did layoffs.

When the Debtor began her Boston practice, she paid her Student Loan sporadically, if at all. During this time she made only three payments, two of $200 and then a bulk payment of $1,330.98 in July, 1998. Most months she paid nothing. Despite the interest cap set in place under the ICRP, the payment defaults apparently caused the outstanding debt to negatively amortize: that is, interest that had not accrued while payments were current was recognized and added to principal. By June 1999, the balance had grown in this way to $153,597.20.

Starting in 2000, the Debtor began writing letters to her Student Loan servicer. She testified that she was "trying to see if we couldn't just negotiate something because . . . the money wasn't there to pay off this loan in the manner at which it needed to be paid off and [the Loan] was just growing." The Debtor's chief concern was that the payments she made under the ICRP did nothing to reduce the principal balance. The size of the Student Loan prevented her from buying a home and starting a family,

---

[2] The Debtor testified that the spike in her earnings for 2007 was due largely to her appearance at this trial.

4

and these were among her concerns. The Debtor enlisted the help of an accountant friend to negotiate with the Student Loan servicer. According to the Debtor, the servicer told her that reducing the size of the principal was non-negotiable. Instead, the servicer suggested that the Debtor go into deferment or forbearance. The record does not indicate whether the Debtor ever pursued deferment or forbearance. On May 15, 2000, she made one further payment—the last of which there is evidence—of $1,000. On June 26, 2001, further unpaid interest was capitalized, increasing the principal balance to $175,964.39.

At some point, the Debtor stopped doing GAL work. She testified, "I was going to try to do something that was more affirmative, focus on strengths rather than the adversarial court system, which I found to be very stressful." All the while, she continued to explore ways to grow her business. Today, her practice generates income primarily through private clients. Some pay out-of-pocket, but most compensation is by insurance coverage. "So long as Blue Cross/Blue Shield stays solvent," she testified, "I have a steady income." As of September, in 2010 her contract with Blue Cross/Blue Shield paid her $90.05 for a session. In April of 2008, the Debtor became certified in executive coaching and moved her practice to the Financial District. In her 2008 deposition, the Debtor estimated that executive coaching could bring in "anywhere from 10-grand to 20-grand to 30-grand, just an engagement." She earned $2,500 for one executive coaching engagement. However, she explained that executive coaching jobs have been harder to come by since the 2008 recession.

The Debtor has tried to supplement her income in other ways, too. In 2009, she started a jewelry business. She testified to "a lot of interest from people about the things that I make." The Debtor had her first jewelry show in November, 2010, and plans to create a website to showcase her creations. The Debtor has also taken writing courses over the years in contemplation of someday writing a book. She speculated that she might be able to go on a lecture circuit. She also mentioned her experience as a television host and producer on the community level, "helping educate the public about divorce and so forth." As for the future, the Debtor testified that she will keep working "as long as I stay

5

healthy." She expects her income to stay the same "at minimum," with the possibility of increased earnings "if the executive coaching world opened up."

### b. Current Income and Expenses

The Debtor's income is derived entirely from her psychology practice. She has no employees. In addition to seeing clients, she does the accounting, insurance billing, marketing, and other administrative tasks. The Debtor submitted her federal income tax returns into evidence. Over six years, they show a general increase in gross earnings, but with large fluctuations: $62,283 in 2004; $76,083 in 2005; $61,628 in 2006; $103,247 in 2007; $74,137 in 2008; and $84,646 in 2009. The Debtor testified that her gross income for 2010 was about $93,000.

The practice's gross income is significantly reduced by business expenses. Since 2004, the Debtor has deducted, on average, over $55,000 per year in business expenses. In 2009, she reported $84,646 in gross income and deducted $44,819 in expenses for her psychology practice. Specifically, she deducted $18,738 for rent, $5,076 for travel, meals, and entertainment, $2,072 for advertising, $959 for "office expenses," and another $14,540 in "other expenses," which included $2,460 for continuing education, $5,202 for transportation, $2,869 for reference books, and $2,941 for telephone and voice mail. She also reported a loss of $9,219 for her jewelry business ($55 in net income against $9,274 in expenses). Accounting for all expenses, the Debtor reported adjusted gross income only $20,430 for 2009.

The record of her gross earnings, business expenses, and adjusted gross income (insofar as there is evidence of these in the record) is as follows:

| Year | Gross Income | Business Expenses | Adjusted Gross Income | Total Income Taxes |
|------|--------------|-------------------|----------------------|--------------------|
| 1995 |              |                   | $40,194              |                    |
| 1996 |              |                   | $35,482              |                    |
| 1997 |              |                   | $34,865              |                    |
| 1998 |              |                   | $27,529              |                    |
| 1999 |              |                   | $31,191              |                    |
|      |              |                   |                      |                    |
| 2004 | $62,283      | $47,962           | $10,934              | $2,641             |
| 2005 | $76,083      | $59,680           | $15,281              | $3,422             |
| 2006 | $61,628      | $60,037           | $11,569              | $1,602             |
| 2007 | $103,247     | $67,267           | $33,621              | $9,911             |
| 2008 | $74,137      | $61,632           | $7,920               | $1,874             |
| 2009 | $84,646      | $54,093           | $20,430              | $5,832             |
| 2010 | $93,000      |                   |                      |                    |

The Debtor's bankruptcy schedules (Schedule I for income, Schedule J for expenses) show monthly income of $8,208.45 against monthly expenses of $8,489.66 resulting in a monthly net loss $281.21. The Debtor deducts $5,034.07 on Schedule J for monthly business expenses. Extrapolated over twelve months, the deductions come to $60,410.04, a figure within the range of the business deductions she reports annually on her federal tax returns. Among the larger business expenses on Schedule J are: $956.66 per month for travel and business development; $824.50 per month for professional dues and education; $403.07 per month for advertising, website fees, and office supplies; and $330.67 per month for office equipment and furnishings.

After accounting for her stated business expenses, her adjusted gross income, as reported on her federal tax returns, shows a pattern of low net earnings: $10,934 in 2004; $15,281 in 2005; $11,569 in 2006; $33,621 in 2007; $7,920 in 2008; and $20,430 in 2009. Most years, this adjusted gross income is so low it would appear to be insufficient to pay even her residential rent, let alone food, medical insurance, transportation, and other necessities, yet she did not indicate that she has suffered such basic privations.

Since filing for bankruptcy relief, her residential rent has increased to $1,550 per month and her health insurance to $450 per month. The Debtor also claimed $684.17 per month on her schedule of expenses for the maintenance and loan payments on her 1999 Saab Convertible. However, after her bankruptcy filing, she surrendered the vehicle to the lender. She now commutes to work on the train; her commuter rail pass costs $163 per month.

Despite a rough correlation between the monthly expenses the Debtor claims on her Schedule J and the annual deductions reported on her tax returns, her testimony indicates that there is some money left over each month for retirement savings:

> Q: [A]t the end of the month is there, after you pay all your bills and your living expenses and business expenses, is there a substantial amount of money left over, or is it a wash, or—
>
> A: Maybe *a thousand or two left over*, perhaps, but, you know, again, I'm—how to say this—some of that money goes towards tax savings,[3] *some of that goes towards my IRA*, you know, that sort of a thing.[4]

It is not clear when or how often "a thousand or two" has been left over. And it is hard to square her testimony that a thousand or two is left over with the low adjusted gross income she has reported over the six years for which tax returns are in evidence.

In any event, in the six years for which her tax returns are in evidence, her total federal and state income taxes have averaged $4,213 per year. Therefore, when money has been left over, most has gone not to taxes but to retirement savings. Still, her retirement savings are very modest, totaling only $30,000, mostly in an IRA and the balance in another retirement account; early withdrawals would be subject to taxes and penalties. There is no indication on Schedule J of monies being channeled into retirement savings. In addition to these retirement accounts, her Schedule B, the schedule of personal

---

[3] I understand "tax saving" to refer to monies the debtor sets aside to pay federal and state income taxes on a quarterly or other basis.
[4] Transcript at p. 30 (emphasis added).

8

property, lists $8,765.30 in various business and personal bank accounts at the time of her bankruptcy filing.

### c. Current Amount Owed on Student Loan

The record makes it difficult for the Court to determine exactly how much the Debtor currently owes on her Student Loan and what her monthly payment is or should be. With respect to the amount of the debt, the parties jointly submitted into evidence a "Certificate of Indebtedness" issued by the DOE. It reveals a total debt of $260,196.21 as of May 14, 2008, with interest accruing at 8.02% per annum, which translates to $38.64 per day. However, in their Joint Pre-Trial Statement, the parties stipulate to a debt of $320,277.11 as of March 25, 2008. The Court has carefully reviewed all the exhibits submitted by both parties in this case and cannot account for why the debt amount stipulated to in the Joint Pre-Trial Statement is nearly $60,000 larger than the amount shown on the Certificate of Indebtedness. In any event, the debt was at least $260,000 as of May 14, 2008, and interest has accrued on that sum throughout the intervening four years. The interest rate is adjustable, and adjustments since 2008 (if any) are not in evidence.

The Court encounters similar difficulty determining the current monthly payment on the Student Loan. The Debtor fails to list an expense for the Loan payment anywhere in her bankruptcy schedules. The DOE submitted evidence relating to the Ford Program, including the ICRP and the Income-Based Repayment Plan ("ICBP"), another repayment option in the Ford Program. However, the Court lacks the necessary information to determine what the Debtor's payments would be under these plans. Nowhere in the record is there a statement of the Debtor's present payment obligations on the Loan or even of the term of the loan.

Further complicating matters, the current default status of the Loan appears to bar the Debtor from resuming repayment under the Ford Program. In 2006, the Loan servicer informed the Debtor that

because the Loan was in default, she would need to "rehabilitate" the Loan to good standing before she could qualify for an ICRP. According to the Debtor, the servicer informed her that the rehabilitation payments would be between $1,600 and $2,500 per month. Frustrated, the Debtor became discouraged and, in her words, "just let go of the process."

The DOE's "Private Collection Agency Procedures Manual" appears to corroborate in part what the loan servicer told the Debtor. The Manual would require, as a condition of rehabilitation, nine monthly payments at 0.76% of her outstanding balance. Assuming the Debtor owes between $260,000 and $320,000, her monthly rehabilitation payment would be between $1,976 and $2,432. This is consistent with the Debtor's testimony. However, the Manual further indicates that if a borrower cannot afford to rehabilitate a loan at this rate, she may instead complete a "statement of financial status" which would then be used to determine an alternate rehabilitation amount based on her actual financial circumstances. Thus it appears that the DOE would allow the Debtor to rehabilitate her Loan based on her actual disposable income. It also appears that the servicer did not so inform the Debtor. Once rehabilitated, the Debtor might be eligible to resume repayment under an ICRP or ICBP.

Should the Debtor resume an ICRP or ICBP, it is unclear how many years of repayment would remain under either plan. Neither plan can exceed 25 years from the date when the borrower begins making payments.[5] However, the time during which the borrower is in default is not included.[6] The legislation enacting the Ford Program does not define the term "default." The DOE submitted a copy of the promissory note the Debtor signed for the Student Loan, but the image quality makes its terms impossible to read. Thus, it is impossible for me to tell when the Debtor defaulted under the terms of the Student Loan or whether the terms of default are described in the note at all. At a minimum the record reflects that the Debtor made payments under her ICRP from 1995 to 2000.

---

[5] 20 U.S.C. § 1087e(d)(1)(D), § 1098e(b)(7)(B). The borrower can also include all previous time periods during which she was not in default under either a graduated or extended repayment plan for loans that are included in her ICRP.

[6] 20 U.S.C. § 1087e(e)(7)(A).

10

**DISCUSSION**

Student loan debt is not dischargeable in bankruptcy "unless excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The debtor bears the burden of showing by a preponderance of the evidence that excepting the debt from discharge would cause her an undue hardship. *See Bronsdon v. Educ. Credit Mgmt. Corp., (In re Bronsdon)*, 435 B.R. 791, 796-97 (B.A.P. 1st Cir. 2010). The Bankruptcy Code does not define "undue hardship." *Sanborn v. Educ. Credit Mgmt. Corp. (In re Sanborn)*, 431 B.R. 5, 8 (Bankr. D. Mass. 2010). This Court, like many other courts in the First Circuit, including the Bankruptcy Appellate Panel, has adopted a totality of the circumstances test for determining whether undue hardship exists in a particular case. *See Bronsdon*, 435 B.R. at 800-01; *Stevenson v. Educ. Credit Mgmt. Corp.,* 2011 Bankr. LEXIS 3031 *21 (Bankr. D. Mass. Aug. 2, 2011); *Sanborn*, 431 B.R. at 7-8; *Brunnell v. Citibank, N.A. (In re Brunnell)*, 356 B.R. 567 (Bankr. D. Mass. 2005). Under the totality of the circumstances test, I must decide whether the Debtor has shown that (1) her past, present, and reasonably reliable future financial resources, (2) her and all her dependents' reasonably necessary living expenses, and (3) other relevant facts or circumstances unique to the case prevent her from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts. *See Lorenz v. Am. Educ. Servs. (In re Lorenz)*, 337 B.R. 423, 430-31 (B.A.P. 1st Cir. 2006). Under this approach the Court may consider all relevant evidence: the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under Chapter 7, and the debtor's ability to find a higher-paying job, move, or cut living expenses. *See id*. Under the totality of the circumstances approach, the debtor's past efforts to repay are considered but are not necessarily dispositive. *See Sanborn*, 431 B.R. at 6. In sum the totality of the circumstances test rests on one question: "Can the debtor now, and in the foreseeable near future, maintain a reasonable, minimal

11

standard of living for the debtor and the debtor's dependents and still afford to make payments on the debtor's student loans?" *Bronsdon*, 435 B.R. at 801, *quoting Hicks v. Educ. Credit Mgmt. Corp. (In re Hicks)*, 331 B.R. 18, 32 (Bankr. D. Mass. 2005).

A debtor's burden of proof is considerable. The First Circuit has stated that by requiring a showing of "undue hardship," Congress decided that "the interest in ensuring the continued viability of the student loan program takes precedence" over the general purpose of the Bankruptcy Code to give debtors a fresh start. *See Nash v. Conn. Student Loan Foundation (In re Nash)*, 446 F.3d 188, 191 (1st Cir. 2006). Undue hardship is generally found only in "truly exceptional circumstances, such as illness or the existence of an unusually large number of dependents." *See id.* at 797; *Sanborn*, 431 B.R. at 6. Applying the totality of the circumstances test to the facts at hand, I conclude that the Debtor has failed to carry her burden.

Since beginning her professional career in 1991, the Debtor's financial resources have increased. Throughout her career, she has proven resourceful in maximizing her earning potential. To supplement her salary at her first job, she successfully petitioned Dartmouth to allow her to see private clients in the evenings. She has proven willing and able to increase her income through independent contracting and additional training. She has become certified in specialty areas of psychology. She is licensed to practice in both New Hampshire and Massachusetts. She has become qualified as a GAL in the Massachusetts probate courts, gained experience with critical stress debriefings, and recently became certified in executive coaching.

The Debtor's work history shows a steady increase in professional qualifications and, with it, increased earnings. Over the last four years, her psychology practice has grossed on average $88,757 annually, albeit with considerable variation from year to year. In the future, she expects her income to at least stay the same. It could just as well rise. The Debtor has only recently started executive coaching. If she manages to establish herself in that field, it is reasonable to assume her appointments

will increase, much like her GAL work did. At trial, the Debtor admitted that she could write a book and has some experience in television production. At fifty-two years old, the Debtor has more financial resources than when she began her career at thirty-two. She has no history of physical or mental illness. At trial, she expressed an intention to work "as long as I stay healthy." I see no reason why the Debtor will not continue to earn at, at a minimum, her present rate for years to come. There is no reason to believe she cannot continue earning at this level until a normal retirement age of 70 or so.

For several reasons, the Debtor has failed to establish that her current expenses prevent her from making significant payment on her Student Loan while maintaining a minimal standard for living. First, the Debtor's bankruptcy schedules, her tax returns, and her own testimony are inconsistent as to her expenses and how much she has left over each month. Second, the Debtor has not provided any information regarding what her currently monthly payment is and what it would be under the various Direct Loan repayment plans, including ICRP and IBRP. Without an accurate picture of the Debtor's reasonably necessary expenses and monthly payment options, I cannot conclude that excepting her Loan from discharge would constitute an undue hardship.

While none of the Debtor's living expenses appear unreasonable, I note that she has exchanged her vehicle for public transportation at $163 per month. Based on her bankruptcy schedules, this exchange nets an additional $521.17 per month. Even assuming that, since she filed, her rent has increased by $150 per month and her health insurance by $115 per month, the Debtor should still have at least $256.17 per month to pay toward her Student Loan.[7]

Since the Debtor is a sole practitioner, her business expenses are inextricably linked to her ability to maintain a minimal standard of living and, therefore, I consider them as well. Unfortunately the documents in evidence when compared with the Debtor's testimony make it difficult to determine what her expenses are. There is some disparity between the itemized deductions the Debtor claims on

---

[7] At trial the Debtor testified that the rent on her Salem apartment is now $1,550 per month compared to the $1,400 she listed on Schedule J. Her health insurance has also increased to $450 per month.

13

her schedule of expenses and those she reports on her federal tax returns. For example, her schedule of expenses shows $1,781.16 per *month* for professional dues, education, travel, and business development. These expenses would reach $21,372 if computed annually. Yet the Debtor's tax returns list similar expenses annually at $5,021 for 2007, $12,654 for 2008, and $5,329 for 2009. The Debtor claims to spend $330 per month on office equipment and furnishings, which translates to $3,960 annually, yet on her Schedule B she values her actual equipment and furnishings at $2,500. It is impossible to tell which of these, the schedule or the tax returns, provides the more accurate picture of her actual expenses. In view of the Debtor's testimony at trial—that she has "maybe a thousand or two left over" each month after paying all living and business expenses—neither appears reliable; there is unexplained inconsistency.[8] Given the inconsistent evidence on expenses, I cannot determine with any confidence what level of repayment her expenses would permit.

    Furthermore, the Debtor gives no explanation of how essential each particular expense is to maintaining her practice. Naturally a proprietor must invest money back into her business. But to prove undue hardship, the Debtor must show that her expenses are necessary to maintain her current level of income. Some of the expenses the Debtor claims on her tax returns and bankruptcy schedules are conspicuously large. On her Schedule J she claims $824.50 per month for professional dues and education and $956.66 per month for travel and business development. Again, given the Debtor's testimony as to a monthly surplus of income, I am unconvinced such large amounts are necessarily expended each month to maintain her business. Finally, I find it significant that, in 2009, the Debtor incurred expenses of $9,274 for a jewelry business that generated only $55 in net income. By simply

---

[8] At trial, the Debtor explained that these monthly savings had to be set aside for "tax savings" and that some of it went to her IRA. Given that the Debtor has never incurred annual income taxes exceeding $10,000, and most years incurred taxes of less than half that much, she should not have to set aside one thousand dollars a month to pay her taxes. The only evidence of the Debtor's contributions to her retirement account is her testimony, averring that she deposited $100 during the month of the trial.

14

forgoing this venture, the Debtor would have had $9,200 available to pay her Loan in 2009—and perhaps also in succeeding years.

Given the disparity between the Debtor's bankruptcy schedules, tax returns, and testimony, I can determine neither what her expenses are nor whether amounts she has stated as expenses are reasonably necessary to maintain her business. Trading in her vehicle for public transportation has netted some additional income. Abandoning her jewelry business could provide more, too. Accordingly, because she has not provided an accurate and reliable picture of her expenses, I find she has failed to carry her burden of showing that she cannot at present make some significant payment on her Student Loan while maintaining a minimal standard of living.

To be sure, the evidence places in question the Debtor's ability to pay this debt in full, especially outside of an ICRP. But an ICRP is available to her. And she has not sustained her burden of proving that she cannot, through such a plan or otherwise, make significant payment on this debt over the 17 or 18 years remaining before she retires.

The totality of the circumstances test also requires that the Court consider "any other relevant facts and circumstances" that pertain to a debtor's ability to repay her loans. Here, I address the Debtor's ability to rehabilitate her defaulted Loan.

At trial, the Debtor testified that, according to conversations with her Loan servicer in 2006, she would need to pay between $1,600 and $2,500 per month for twelve months to bring the Loan into good standing before she could resume the ICR plan. The Debtor argued that rehabilitation of the Loan was a barrier to repayment because of the high monthly rehabilitation payments. The DOE's "Private Collection Agency Procedures Manual" appears to corroborate in part the Debtor's position but also to put it partly into question. The Manual would require, as a condition of rehabilitation, nine monthly payments at 0.76% of her outstanding balance. Assuming the Debtor owes between $260,000 and $320,000, her monthly rehabilitation payment would be between $1,976 and $2,432. This is consistent

15

with the Debtor's testimony. It is not clear to the Court that the Debtor cannot afford these payments. However, even if she cannot afford these payments, the Manual further indicates that if a borrower cannot afford to rehabilitate a loan at this rate, she may instead complete a "statement of financial status" which would then be used to determine an alternate rehabilitation amount based on her actual financial circumstances. Thus, it appears that the Debtor may rehabilitate her Loan based on her actual disposable income, whatever it is, if that income does not permit her to make the rehabilitation payments required by the formula. Once rehabilitated, the Debtor would be eligible to resume repayment under an ICRP.

The Debtor has submitted a post-trial brief in which she makes two final arguments for discharging the Student Loan. First, she argues that her age combined with the amount she currently has to repay results in an undue hardship. Second, she points out that loan forgiveness at the end of an ICRP would give rise to income tax liability that would itself create an undue hardship.

As to the Debtor's first argument, I am unwilling to find that the circumstances of her age and the size of the Student Loan, without more, constitute an undue hardship. Such a finding would obviate the requirement that a debtor show a present and future inability to repay the loan while maintaining a minimal standard of living. Moreover, the cases the Debtor cites in support of such a discharge are distinguishable from her own situation. In *Williams v. Educational Credit Management Corporation (In re Williams)*, 301 B.R. 62, 79 (Bankr. N.D. Cal. 2003), the Court discharged over $150,000 in student loans owed by a couple in their fifties who operated a chiropractic practice. Finding undue hardship, the Court noted that chiropractors typically retire at age sixty due to the physical demands of the job, meaning the debtors' income would likely decrease in the future. At their age, it was impractical to expect them to embark on new careers that would match their current earnings. *Id.* at 77. In the present case, the Debtor has not shown that she will be physically unable to practice psychology as she grows older.

16

In an admittedly close case, the Bankruptcy Appellate Panel for the Eighth Circuit affirmed a bankruptcy court's decision discharging over $50,000 in student loans owed by a thirty-five-year-old debtor with no dependents.  *See Cline v. Illinois Student Loan Assistance Ass'n (In re Cline)*, 248 B.R. 347, 349 (B.A.P. 8th Cir. 2000). The court determined that the only work the debtor could endure was essentially ministerial and that she suffered from the stress of increased responsibility due to a lack of self-confidence.  *Id.* at 350.  Since she had never earned more than $25,000 per year since earning her degree, the court concluded that she would never be able to afford payments on her student loans, even under an ICRP.  *Id.* at 351.  The Debtor in this case shows none of the earning limitations of the debtor in *Cline*.  She has run her own practice since 1997 and has continually proved able to seek new employment in her field.

The third case the Debtor cites, *Peel v. Sallie Mae Servicing-Heal Loan (In re Peel)*, 240 B.R. 387 (Bankr. N.D. Cal. 1999), involved another chiropractor who successfully discharged his student loans. Although the debtor was thirty-three, with no dependents and no physical or mental impairments affecting his ability to earn a living, the court found he could not realistically make ends meet as a chiropractor and had limited growth potential in his present job, where he earned slightly over $25,000 per year.  *Id.* at 389.  I have reached the opposite conclusion regarding the Debtor in the present case. For nearly two decades she has supported herself with her degrees in psychology.  While I acknowledge that the size of the Student Loan has factored into her decision to put off buying a house and starting a family, this cannot be the grounds for a discharge.  Financial adversity alone is not sufficient to have a student loan debt discharged on the basis of undue hardship.  *Brunell*, 356 B.R. at 578.

The Debtor's second argument is that participation in an ICRP would, upon the conclusion of her repayment period, result in forgiveness of the remaining debt, and this debt forgiveness would in turn constitute taxable income and give rise to tax liability that would itself constitute an undue hardship for the debtor, who would then be in retirement.  The Debtor has not supported this argument with

estimates of the amount of debt that would be forgiven or citations to or explanations of the relevant tax laws.

I find that the Debtor has failed to demonstrate that the forgiveness of debt through an ICRP would give rise to a significant tax hardship in the future. In another dischargeability proceeding concerning student loans, the District Court has explained the relevant tax law:

> [T]ax liability is not certain to flow from the discharge of the remaining debt at the end of the 25-year period. 26 U.S.C. § 108(a)(1)(B) excludes from gross income "any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if the discharge occurs when the taxpayer is insolvent," provided that, under § 108(a)(3), "the amount excluded under paragraph (1)(B) shall not exceed the amount by which the taxpayer is insolvent." For the "purposes of [section 108], the term 'insolvent' means the excess of liabilities over the fair market value of assets" at the time immediately before the discharge of the debt. 26 U.S.C. § 108(d)(3); see *Merkel v. Comm'r of Internal Revenue*, 192 F.3d 846 n. 3 (9th Cir. 1999) (applying definition). . . . See 26 U.S.C. § 108(a)(1)(B), (a)(3), (d)(3); *Toberman v. Comm'r of Internal Revenue*, 294 F.3d 985, 988 (8th Cir. 2002)(quoting *Comm'r v. Tufts*, 461 U.S. 300, 310 n. 11, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983)).

*Educational Credit Management Corporation v. Bronsdon (In re Bronsdon)*, 421 B.R. 27, 35 (D. Mass. 2009). Tax liability is therefore not certain to flow from discharge of liability under an ICRP. Rather, a participant in an ICRP will realize taxable income only to the extent that, immediately before the discharge, her assets exceed her liabilities. *Id.*; 26 U.S.C. § 108(a)(1)(B), (a)(3), (d)(3). The Debtor has offered no projections regarding the extent of her solvency or insolvency at the end of the period. In view of the fact that (i) she has at present almost no assets and at least $300,000 in Student Loan debt and (ii) under an ICRP she would be paying on this debt for the balance of such a plan to the extent of her ability, it is highly unlikely that, upon completion of her payments, her assets would exceed her liabilities. She has not satisfied her burden of proving otherwise. The Court therefore concludes that the Debtor has not demonstrated that the tax consequences of her participation in an ICRP would constitute an undue hardship.

In summary, the Debtor has appreciable gross income and the ability to continue earning at this level until retirement.  She has not demonstrated by a preponderance of the evidence that her necessary business expenses, in combination with her personal necessities, leave her without ability to pay on her debt.  She has some ability to pay, but the extent of her ability is unclear.  Her debt is mammoth, but it appears that she would qualify for an ICRP, under which she would pay the debt only to the extent of her ability to pay, with the balance to be discharged at the end of its term, apparently without adverse tax consequence.  The size of her debt is partially a function of multiple compoundings of interest, but it's also true that the extent of her repayment does not come close to even the original principal amount of the debt, let alone with even simple interest.  In addition, she has not made a payment on the debt in twelve years; this initially was a result of insufficient funds but later, when some payments could have been made—albeit not at a level adequate to the size of the debt—was the result of frustration, discouragement, denial, and a hope that the debt would not prove insistent.  I cannot credit her with a good faith effort at repayment.  For all these reasons, any hardship from the nondischarge of this debt is not undue.

**CONCLUSION**

In sum, under the totality of the circumstances, I find and conclude that the Debtor has failed to demonstrate by a preponderance of the evidence that excepting the Student Loan from discharge would impose an undue hardship upon her.  Judgment shall enter in favor of the United States, declaring that the debt is excepted from discharge.

Date:  April 24, 2012

_____
Frank J. Bailey
United States Bankruptcy Judge